UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ERLINDA URSUA, )<br>LORENZO URSUA, individually )<br>and as Executor for the )<br>ESTATE OF ERLINDA URSUA, )<br>ROXANNE BAUTISTA and RHODORA)<br>URSUA, )<br>            )<br>        Plaintiff(s), )<br>            )<br>    v. )<br>            )<br>ALAMEDA COUNTY MEDICAL )<br>CENTER, et al., )<br>            )<br>        Defendant(s). )<br>_____) | No. C 04-3006 BZ<br><br>**ORDER GRANTING DEFENDANT ALAMEDA COUNTY MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs, the estate and family of Dr. Erlinda Ursua, filed this action pursuant to 42 U.S.C. § 1983 against defendant Alameda County Medical Center (the "Medical Center"), alleging a violation of Dr. Ursua's Fourteenth Amendment rights.  They also sued Alameda County (the "County") and ABC Security Service, Inc. ("ABC") for negligence.[1]  Now before me is the Medical Center's motion for

---

[1] All parties have consented to my jurisdiction pursuant to 28 U.S.C. § 636(c).

1

1  summary judgment.

2   Viewed favorably to plaintiffs, <u>Matsushita Elec. Indus.</u>
3  <u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the
4  material facts and evidence show that Dr. Ursua was employed
5  by the Medical Center to take histories and conduct physical
6  examinations of patients admitted to the John George
7  Psychiatric Pavilion (the "JGPP").[2]  The JGPP, which treats
8  mental patients, was considered a dangerous place, with
9  numerous incidents of assaults on the staff by the patients
10 (PF 77-81).  In early 2003, individually and collectively, the
11 staff notified the Medical Center of their safety concerns.
12 Not satisfied with the Medical Center's response, the staff
13 complained to the State of California's Division Occupational
14 Safety and Health ("OSHA") (PF 107, 110), which on June 24,
15 2003 issued a Citation and Notification of Penalty (PF 123)
16 for a serious violation of California Code of Regulations §
17 3203(a)(6) and directed the JGPP to adopt safety policies and
18 procedures (PF 121, 123, 125).  Except for the addition of a
19 security guard, the Medical Center did little to address
20 employee safety prior to Dr. Ursua's death.  Staff complaints
21 continued.  The Medical Center relied on an accepted,
22 unwritten policy using a "buddy system" requiring staff be
23 accompanied by "another person at all times when dealing with

---

[2] The objections of the Medical Center and the County to plaintiffs' evidence are **OVERRULED**.  The Medical Center's and County's objections to "all opinion testimony offered in plaintiffs' Exhibits 6, 10 and 22" (Objections ¶ 2) are **OVERRULED** on the additional ground that they do not adequately specify the particular evidence to which defendants are objecting.

2

1    patients" (PF 119) and the presence of a panic button in each
2    examination room, which, if pressed, would have activated
3    alarms and lights in the hallway and at the nurses' stations.
4    The Medical Center also employed ABC which provided security
5    guards.
6        On the afternoon of November 19, 2003, Renee Pavon, an
7    admittee to the JGPP, assaulted and killed Dr. Ursua when the
8    doctor was taking a history and conducting a physical
9    examination of Pavon, alone, in Room B18 (also known as Room
10   1319 before the JGPP opened)(PF 6).  Room B18 is an isolated
11   room between Units B and C of the JGPP, approximately 100 feet
12   from the nearest nurses' stations (PF 9, 10).  Room B18 is in
13   a hallway with locked doors on both ends, inaccessible by
14   patients unaccompanied by staff (PF 8) and not patrolled by
15   ABC.  In fact, one of the security guards on duty the day of
16   Dr. Ursua's death was unaware that the hallway existed (Decl.
17   of Seaton, Exh. 20, Kumar Deposition at 15).  The other
18   security guard on duty had never been in the hallway before
19   Dr. Ursua's death (Decl. Of Seaton, Exh. 19, Moreno Deposition
20   at 65).  There had been no history of assaults by patients in
21   that room.
22       In moving for summary judgment, the Medical Center relies
23   on Collins v. City of Harker Heights, 503 U.S. 115 (1992),
24   which held that "the Due Process Clause does not impose an
25   independent federal obligation upon municipalities to provide
26   certain minimal levels of safety and security in the
27   workplace."  Id. at 130.  Following Harker Heights, the Ninth
28   Circuit held that a plaintiff may properly state a claim under

the Due Process Clause where the state engaged in affirmative conduct which placed the plaintiff in danger. See <u>L.W. v. Grubbs</u> ("Grubbs I"), 974 F. 2d 119, 121 (9th Cir. 1992).  The Ninth Circuit later clarified this "danger creation" exception, holding that "in order to establish Section 1983 liability . . . the plaintiff must show that the state official participated in creating a dangerous condition, and acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it" <u>L.W. v. Grubbs</u> ("Grubbs II"), 92 F. 3d 894, 900 (9th Cir. 1996).

Plaintiffs assert that the Medical Center placed Dr. Ursua in danger.  In particular, plaintiffs argue that despite knowledge of prior attacks by patients, complaints from its employees and citations from OSHA, the Medical Center continued to use Room B18, failed to adopt a written policy requiring an attendant to accompany a doctor during an examination and failed to provide doctors with personal alarms.  Accepting these facts as true, I find that, as in <u>Harker Heights</u>, plaintiffs have shown only that the Medical Center maintained an unsafe work environment.  They have failed to show any affirmative act on behalf of the Medical Center that caused or increased the danger to Dr. Ursua. <u>Compare</u> <u>Grubbs I</u>, 974 F. 2d at 122-23 (a supervisor instructed the plaintiff to enter a work area with a violent sex offender knowing there was a significant risk of injury and after promising that the plaintiff would not have to work with sex offenders).  Plaintiffs have not cited any case, and the court can find none, holding that a failure to act in the face of

4

knowledge of dangerous conditions causes or contributes to the creation of a danger, to satisfy the Grubbs I "danger creation" exception to the Harker Heights rule exempting municipalities from liability.[3]

The record shows, and plaintiffs do not dispute, that the Medical Center had measures in place to try to minimize the danger to employees such as Dr. Ursua. Although the policy was unwritten and staff may not have always complied with it (PF 120), the Medical Center encouraged staff to use a "buddy system" and to attend to patients with other staff members present. Plaintiffs emphasize the OSHA citations and staff complaints to attempt to show that the Medical Center had knowledge of the dangers of working in the JGPP and did not address or mitigate such dangers. But the Supreme Court in Harker Heights expressly rejected a constitutional duty to mitigate such dangers. "The Due Process Clause is not a guarantee against incorrect or ill-advised personnel decisions. Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm." Harker Heights, 503 U.S. at 129 (internal quotes and citation omitted).

To prevail, plaintiffs must demonstrate, at the very least, that the Medical Center acted affirmatively and with

---

[3] Plaintiffs mistakenly rely on Wood v. Ostander, 879 F.2d 583 (9th Cir. 1989), which held that a state trooper who arrested a driver and impounded his car, created a danger by leaving the plaintiff, the intoxicated passenger, in a crime-ridden area where she was assaulted. Plaintiffs do not point to any behavior on the part of the Medical Center that created a similar danger for Dr. Ursua as she carried out her regular work duties.

5

1  deliberate indifference, in creating a foreseeable danger
2  leading to the deprivation of Dr. Ursua's constitutional
3  rights.  <u>Huffman v. County of Los Angeles</u>, 147 F. 3d 1054,
4  1061 (9th Cir. 1998).  Plaintiffs have not pointed to any
5  facts in the record which show that the Medical Center would
6  have denied a request by Dr. Ursua to have another staff
7  member accompany her or to use another, less isolated room to
8  conduct Pavon's history and examination.  Plaintiffs do not
9  dispute the presence of a panic button in Room B18 (PF 13) and
10 the employment of security guards.  The misconduct alleged
11 here was not affirmative action but rather involved alleged
12 inaction – failure to take sufficient safety precautions for
13 employees – and this inaction does not constitute the kind of
14 affirmative action necessary to state a federal due process
15 claim.
16      Having concluded that plaintiffs have failed to establish
17 that the Medical Center acted affirmatively to create a
18 dangerous condition, I need not reach the issue whether the
19 Medical Center acted with deliberate indifference.
20      **IT IS ORDERED** that the Medical Center's motion for
21 summary judgment is **GRANTED**.
22 Dated:  October 27, 2005

                                    _____
                                         Bernard Zimmerman
                                    United States Magistrate Judge


G:\BZALL\-BZCASES\ESTATE OF URSUA\SJM.MEDICAL.ORD2.wpd

6